IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| KIRK CHRZANOWSKI, | ) | |
| | ) | Case No. 12-cv-50020 |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| LOUIS A. BIANCHI, et al., | ) | Judge Philip G. Reinhard |
| | ) | |
| Defendants. | ) | |

## ORDER

For the reasons stated below, defendants' motion for summary judgment [107] is denied with respect to defendant Bianchi and granted with respect to defendant Combs.

## STATEMENT-OPINION

On April 8, 2015, defendants Louis A. Bianchi and Michael P. Combs filed their joint motion for summary judgment [107], as well as their memorandum in support [108] and Local Rule 56.1(a)(3) statement of facts [109]. Defendants contend that plaintiff Kirk Chrzanowski has failed to raise a genuine issue of material fact as to whether they retaliated against him in violation of his First Amendment rights and 42 U.S.C. § 1983. On May 20, 2015, plaintiff filed his response [113], memorandum in support [112], Rule 56.1(b)(3)(A)-(B) response to defendants' statement of facts [114], and Local Rule 56.1(b)(3)(C) statement of additional facts [115]. On June 3, 2015, defendants filed their reply [117], response to plaintiff's statement of additional facts [118], and a reply to plaintiff's response to defendant's statement of facts [119]. Defendants' motion for summary judgment is now ripe for the court's review.

On summary judgment, the court construes all facts and draws all inferences in the light most favorable to the non-moving party. *Schepers v. Commissioner, Indiana Dept. of Corrections,* 691 F.3d 909, 913 (7th Cir. 2012). The court does not weigh evidence or determine the credibility of witness testimony. *O'Leary v. Accretive Health, Inc.,* 657 F.3d 625, 630 (7th Cir. 2011). Instead, the court only grants summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). That said, Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Prior to addressing the merits of defendants' motion, it is necessary to set forth the undisputed facts located in the parties' Local Rule 56.1 Statements of Material Fact. In addition, the court is cognizant of its obligation to construe all disputed and undisputed facts in the light most favorable to plaintiff and does so accordingly. *See Schepers*, 691 F.3d at 913.

## A. FACTUAL BACKGROUND.

At the relevant time, plaintiff Kirk Chrzanowski was employed as an assistant state's attorney for McHenry County, serving under State's Attorney Louis A. Bianchi. [119] at ¶ 4. Plaintiff was hired in January of 2006 as a prosecutor in the misdemeanor division. [118] at ¶ 1. In February of 2008, he was promoted to the felony division and, in June of 2008, he was given more responsibility and assigned to narcotics prosecution and review. *Id.* During his tenure, plaintiff received several commendations for his work as a prosecutor and received positive reviews and salary raises in the years 2006, 2007, twice in 2008, 2009, and 2010. [118] at ¶ 2. Plaintiff's responsibilities as a prosecutor included completing discovery, communicating with defense counsel, and tendering plea offers. [119] at ¶¶ 5-6. Prior to the events giving rise to this lawsuit, plaintiff had not received any negative feedback in his personnel file from Bianchi. [118] at ¶ 3. Plaintiff's immediate supervisor at the relevant time was Phil Hiscock, chief of the criminal division. [119] at ¶ 21; [109-2] at 4.

In 2010, plaintiff was the prosecutor primarily responsible for the prosecution of *People v. Jeremy Reid* against defendant Jeremy Reid. [119] at ¶¶ 7, 16. Reid was indicted on two counts of unlawful delivery of a controlled substance and two counts of unlawful possession of a controlled substance. [119] at ¶ 8.

While prosecuting the Reid case, plaintiff prepared a blue back, a paper attached to a felony file, to record important information relevant to the case; all the entries in the blue back are in his handwriting. [119] at ¶¶ 10-11, 28-29. Notes in a blue back are used if there is a need to go back and see how a case evolved, and Hiscock testified that he expected assistant state's attorneys to record information accurately. [119] at ¶¶ 12, 14. It was plaintiff's practice to record accurate and truthful information that he through was important to a case close to the time when the event took place; he tried to record information in chronological order. [119] at ¶¶ 13, 30-31, 35. Making entries on blue backs was part of plaintiff's duties as an assistant state's attorney. [119] at ¶ 75.

The blue back plaintiff prepared in the *Reid* case reflects events that occurred during the prosecution of that case, particularly with regard to discussions surrounding the prospect of a negotiated plea that began in May of 2010. *See* [119] at ¶¶ 56-57; [109-6] at 3. Many of the events recorded in the blue back are undisputed. On May 6, 2010, plaintiff recorded that he had offered 5 years imprisonment in IDOC for a Class 1 felony to Chris Harmon, Reid's attorney. [109-6] at 3; [109-2] at 8-9. Harmon requested an "option play" for Reid and "a plan of 8 yrs IDOC (Boot Camp) on Class 1." [109-6] at 3; [119] at ¶ 56. It is undisputed that plaintiff needed Hiscock's approval to reduce the plea offer. [119] at ¶ 63.

2

Later on May 6, 2010, plaintiff recorded that he spoke to Hiscock about the prospect of a negotiated plea, and Hiscock "is torn between 4 yrs on Class 1 or 8-yrs Boot Camp on Class 1. Wants officers' input + mitigation info." [109-6] at 3. Following this conversation, on May 7, 2010, plaintiff recorded that he spoke to the Sergeant Tippet of the arresting agency about the plea, who informed him that "they WON'T agree to Boot Camp on Class 1 but they are OK w/ 4 yrs on Class 1." *Id.*; [119] at ¶¶ 57, 64-65. On June 16, 2010, plaintiff recorded that "Chris Harmon wants 8 yrs IDOC on Class 1 w/ Boot Camp." [109-6] at 3. Later on June 16, 2010, plaintiff recorded that he again spoke to Sergeant Tippet and "he's OK w/ 8 yrs IDOC Boot Camp" on the condition that Reid cooperate with the arresting agency's investigation against two other targets. *Id.* On July 21, 2010, plaintiff recorded that "Harmon's last req. 4 yrs on Class 1 + we can close file." *Id.*

The parties dispute what occurred next. According to plaintiff, on August 9, 2010, he received a telephone message regarding the Reid case from Ronald Saldago, the McHenry County State's Attorney's Chief Investigator. [119] at ¶¶ 12, 14, 39. It is undisputed that Reid was indirectly related by marriage to Salgado. [119] at ¶¶ 15, 18. Salgado was a close friend of Bianchi and one of his most trusted advisors. [119] at ¶ 69. Hiscock testified that he was aware of a familial relation between Salgado and Reid, but did not make an effort to screen him from the Reid case because he did not believe there was a conflict – Salgado had not been personally involved in the investigation and had no supervisory position over any of the prosecutors, including plaintiff. [119] at ¶¶ 22-23, 59; [109-2] at 3, 7-8. At some time prior to August 9th, Salgado had discussed with plaintiff the fact that he was related to Reid. [109-2] at 14.

Plaintiff recorded in the blue back an entry dated August 9, 2010 stating "phone msg from Ron [Salgado] saying Phil [Hiscock] approved 4 yrs on Class 1." [109-6] at 2 [119] at ¶ 34 (brackets included in statement of facts for context). Plaintiff testified that Salgado's voicemail shocked him because it was inappropriate, and he was skeptical that Hiscock had actually discussed the plea with Salgado. [119] at ¶ 52; [109-2] at 15. Salgado had never communicated with plaintiff about a plea deal in any of his prior cases. [119] at ¶ 55. Hiscock testified that he does not recall discussing a four-year plea with Salgado or asking him to relay a message to plaintiff. [119] at ¶ 54.

Defendants dispute that Salgado left a voicemail for plaintiff regarding the Reid plea. They point to the fact that every notation in plaintiff's blue back for the Reid file was in chronological order, with one exception. [119] at ¶ 32. The August 9th entry regarding the Salgado voice mail appeared at the very bottom of the first (front) page, following a March 30, 2010 entry. [119] at ¶ 33. The second (back) page begins with a May 6, 2010 entry. *Id.* Near the bottom of the second page is the July 21st entry regarding Harmon's request for four years on Class 1. [119] at ¶ 36; [109-6] at 2. There is approximately three inches of space below the July 21st entry and the bottom of the second page. *Id.* Taking up a majority of that space is an August 10th entry, regarding a meeting between plaintiff, Bianchi, and Hiscock, which directly follows the July 21st entry. *Id.*

It is undisputed that on August 10, 2010, plaintiff met with Bianchi and Hiscock to discuss the terms of the Reid plea before a scheduled change-of-plea hearing. [118] at ¶ 4; [119] at ¶ 9. Bianchi stated that the purpose of the meeting was to make sure the plea went forward as Reid's

3

family was anxious. [118] at ¶ 4. Plaintiff does not recall mentioning the Salgado voicemail to Bianchi or Hiscock at that time. [119] at ¶ 9. Bianchi and Hiscock agreed to offer 4 years on a Class 1 felony as a negotiated plea. [119] at ¶ 66. Plaintiff testified that "I remember there being a consensus between Mr. Bianchi and Mr. Hiscock that was the appropriate sentence to be offered in the case." [109-2] at 28. Plaintiff recorded this conversation in the blue back in an August 10, 2010 entry, stating "[d]iscussed 4 yrs on Amended Class 1 Felony w/Lou [Bianchi] + Phil [Hiscock] + they agree w/ neg[otiated] plea." [109-6] at 3 (brackets included for context). Bianchi testified that he had spoken to Salgado about Reid before the August 10, 2010 meeting and Salgado had relayed that "[t]he family and Jeremy Reid wanted to get it over with." [109-3] at 5.

Following the meeting, plaintiff presented the 4-year negotiated plea in court. [109-1] at 35. According to plaintiff, Bianchi was in court and gestured to Reid's family during the plea. *Id.* It is undisputed that the disputed August 9, 2010 Salgado voicemail did not influence the outcome of the Reid plea. [118] at ¶ 12. Plaintiff testified that at the time Reid pleaded guilty, he had no reason to believe that Bianchi had improperly influenced the plea and he would not have presented the plea if he believed it to be improper. [119] at ¶¶ 60-61; [109-2] at 22-23.

After the Reid plea had been completed, Bianchi was investigated and prosecuted in *People v. Bianchi*, Case No. 11-CF-169 (McHenry County Circuit Court). [119] at ¶ 19. The special prosecutor's allegations included that Bianchi improperly influenced a negotiated plea. [118] at ¶ 5. On February 24, 2011, the grand jury returned an indictment against Bianchi on charges of official misconduct. [118] at ¶ 6.

During the Bianchi trial, the special prosecutor alleged that Jeremy Reid was Salgado's nephew. [119] at ¶ 17. Plaintiff testified before the grand jury on February 10, 2011 and at Bianchi's August 1, 2010 trial, both times pursuant to subpoena. [119] at ¶ 24; [118] at ¶¶ 5-6. He did not request or use benefit time while testifying at these proceedings and he was paid his normal salary during those periods. [119] at ¶¶ 26-27. Plaintiff's testimony on both occasions involved the Reid case, including the August 9, 2010 Salgado voicemail and Bianchi's gesture to Reid's family in court on August 10, 2010 during the negotiated plea. [119] at ¶ 25; [109-1] at 35.

After plaintiff testified at the grand jury proceedings, Salgado attempted to contact plaintiff but plaintiff refused to speak to him. [118] at ¶ 7. Bianchi's attorney also attempted to contact plaintiff and plaintiff refused to discuss the case with him. [118] at ¶ 8. Following the special prosecutor's case-in-chief at the trial, Bianchi was acquitted after he moved for and was granted a directed verdict. [119] at ¶ 20.

Following plaintiff's grand jury and trial testimony, Bianchi began taking steps against him. In his deposition, Bianchi agreed that at some point after plaintiff's testimony, he asked an assistant state's attorney to perform "legal research regarding [whether] an employee could be terminated after they testified in a case[.]" *See* [118] at ¶ 10; [115-3] at 10. In addition, after February of 2011, Bianchi began placing several memorandums in plaintiff's personnel file with negative criticisms unrelated to his job performance as a felony prosecutor. [118] at ¶ 9. For example, on June 6, 2011,

4

Bianchi noted that plaintiff had failed to introduce him to "two college females who are spending their internship here at the office." *Id.* At the time, plaintiff was unaware of Bianchi's actions. *Id.*

The circumstances that led to plaintiff's termination also occurred during this time. Following his acquittal, Bianchi reviewed the Reid file and plaintiff's blue back. [119] at ¶ 37. Bianchi testified that at this time he began to question the accuracy of the August 9, 2010 entry regarding Salgado's voicemail. *Id.* Bianchi obtained Salgado's phone records for his home land line, his cell phone, and his wife's cell phone. [119] at ¶ 38. He obtained vacation schedules for Hiscock and Salgado. *Id.* Salgado was on vacation in Florida from August 5, 2010 to August 15, 2010. [119] at ¶ 40. Hiscock's 2010 attendance schedule reflects that he was out of the office from August 2 through August 6, 201. [119] at ¶ 41. The Salgado phone records which Bianchi obtained did not reflect a call to plaintiff's work extension on either August 9, 2010 or the three days prior. [119] at ¶ 42.

Bianchi then asked Michael Combs, another ASA, to review materials in the Reid file, as well as the phone records, vacation schedules, and other materials he had collected to determine whether plaintiff had falsely entered the August 9, 2010 entry in the blue book. [119] at ¶ 43. It is undisputed that Combs was Bianchi's friend and political ally. [118] at ¶ 12. Combs reviewed the documents provided by Bianchi and spoke to Salgado, who denied placing the voicemail. [119] at ¶ 44. After his review, Combs informed Bianchi that he had determined that the blue back entry referring to the voicemail was false. [119] at ¶ 45.

At this time, Bianchi planned to terminate plaintiff, but first reviewed twelve to fifteen of plaintiff's prosecution files to determine if the Reid plea was consistent with the other files to "cover his bases" before firing him. [118] at ¶ 11.

On December 2, 2011, plaintiff was called from his regular duties to a closed-door meeting in Bianchi's office with Bianchi, Combs, and Investigator James Kelsch. [118] at ¶ 13; [119] at ¶¶ 46, 70. Bianchi testified that his plan prior to the meeting was to fire plaintiff at the meeting. [118] at ¶ 13. Combs did all of the questioning at the meeting. [109-1] at 25. Combs asked whether the August 9th blue back entry was accurate and whether plaintiff had actually received a voicemail from Salgado. [119] at ¶ 46. Plaintiff stated that he did receive the voicemail. [119] at ¶ 47. Combs questioned plaintiff regarding the blue back and the Salgado voicemail, showing plaintiff transcripts of his grand jury and trial testimony in the Bianchi prosecution, as well as phone records which, according to Combs, showed that there was no voicemail. [118] at ¶ 13; [119] at ¶ 70. Plaintiff then asked for an attorney and refused to answer additional questions. [119] at ¶¶ 48-49. Bianchi informed plaintiff that he would be terminated for refusing to answer questions but offered him the opportunity to resign, which plaintiff refused. [119] at ¶¶ 50-51. Bianchi then said "you are fired, get out." [109-1] at 26. It is undisputed that Bianchi is the only individual with authority to terminate an assistant state's attorney. [119] at ¶ 72.

5

Plaintiff testified that in addition to him, four individuals who testified in the special prosecution's case in chief were terminated or asked to resign, although other individuals who testified were not. [109-1] at 31; [119] at ¶ 68.

Following his termination, on December 23, 2011, plaintiff's counsel hand delivered a letter to the State's Attorney's Office requesting plaintiff's personnel file. [118] at ¶ 14. At 4:10 p.m. that day, Bianchi filed a complaint against plaintiff with the ARDC alleging that he made a false entry on the blue back. *Id.*

As relevant to the discussion below, the parties dispute whether plaintiff's grand jury and trial testimony could be construed as "against" Bianchi since plaintiff testified that he had no reason to believe that Bianchi improperly influenced the Reid plea. When asked to explain, plaintiff testified that his testimony "was being presented against Mr. Bianchi in whatever big picture the prosecution was putting together to support his conviction." [109-1] at 40; [119] at ¶ 67. He testified that "[m]aybe Mr. Bianchi took issue with the fact that I relayed that he was in court and that he gestured to the family. I mean, maybe Mr. Bianchi took issue with my testimony, period. Or the fact that I met with the special prosecutors. His attorney certainly took issue with that." [109-1] at 35. Finally, when asked "how would your testimony, assuming it was against Mr. Salgado, be testimony against Mr. Bianchi?," plaintiff answered "Mr. Salgado and Mr. Bianchi have been friends for years. And if it came to a pick and choose, I was out the door well before Mr. Salgado ever was leaving this office. Mr. Salgado was way more important to Mr. Bianchi than I ever was going to be." [109-1] at 39.

The parties also dispute whether Combs's actions constituted retaliation against plaintiff. When asked to explain his position, plaintiff testified that "Mr. Combs by interrogating me retaliated." [109-1] at 33. When asked "[h]ow is that retaliation[,]" he answered "[y]ou have given truthful testimony and the way that it's responded to is bringing you in a locked office and without an opportunity to have legal counsel present and a fair opportunity to represent yourself. I don't see how that is anything but a retaliation." *Id.*

## B. ANALYSIS

"It is well-established in our jurisprudence that a public employee does not shed his First Amendment rights at the steps of the government building." *Lalowski v. City of Des Plaines*, 789 F.3d 784, 790 (7th Cir. 2015) (quoting *Vargas–Harrison v. Racine Unified Sch. Dist.*, 272 F.3d 964, 970 (7th Cir.2001)). "However, 'the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general.'" *Lalowski*, 789 F.3d at 790 (quoting *Kiddy–Brown v. Blagojevich*, 408 F.3d 346, 358 (7th Cir.2005)). "Thus, a unique constitutional framework applies: When a plaintiff brings a § 1983 claim for retaliation in violation of First Amendment rights in the employment context, our analysis involves three steps. First, the court must determine whether the employee's speech was constitutionally protected under the *Connick–Pickering* test. Second, the plaintiff must establish that the speech was a substantial or motivating factor in the alleged

6

retaliatory action. Finally, if the plaintiff satisfies the first two steps, the defendant has an opportunity to establish that the same action would have been taken in the absence of the employee's protected speech." *Lalowski*, 789 F.3d at 790 (quoting *Hutchins v. Clarke*, 661 F.3d 947, 955 (7th Cir.2011)).

As a preliminary matter, plaintiff has already succeeded in establishing the first step. Plaintiff contends that he was terminated in retaliation for his truthful testimony before the grand jury and at trial in the Bianchi prosecution. On July 6, 2012, the court granted defendants' motion to dismiss this action on the basis that plaintiff's testimony was not protected speech. *See* [46]. The court's reasoning was that plaintiff testified pursuant to his official duties rather than as a private citizen, because his duties as a prosecutor included the pursuit of all criminal offenses, even those allegedly perpetrated against his supervisors; in the alternative, the court found that defendants were entitled to qualified immunity. *See id.* On August 2, 2013, the Seventh Circuit reversed, finding that "providing eyewitness testimony regarding potential wrongdoing, civil or criminal, was never 'part of what [Chrzanowski] was employed to do'" and thus "Chrzanowski's rights were clearly established at all relevant times." *See Chrzanowski v. Bianchi*, 725 F.3d 734, 743 (7th Cir. 2013) (alterations in original).[1]

Defendants nonetheless argue that they are entitled to summary judgment on this issue, claiming that factual development following discovery has changed the analysis. First, they claim that "[h]aving now completed discovery . . . it is clear that Plaintiff was expected to engage in such speech in the course of his employment." [108] at 13. To support this contention, defendants point out that Combs testified that he occasionally "testified as an assistant state's attorney and that in some counties, such as Cook, assistant state's attorneys regularly testify." *Id.* at 14. Moreover, they point to the fact that plaintiff testified in the Bianchi matter "as a county-paid employee, not on personal time. . . . Had he believed that he gave testimony as a private citizen, Plaintiff could and should have used paid time off." *Id.* Finally, defendants rely on the recent Supreme Court decision in *Lane v. Franks*, 134 S. Ct. 2369 (2014), asserting that "the Supreme Court, in *Lane*, held that testimony outside the scope of a plaintiff's job responsibilities is protected speech, but left open the question whether speech within the scope of a plaintiff's duties is protected speech." *Id.* at 15.

Defendants' arguments do not convince the court that the analysis has changed substantially since the Seventh Circuit's ruling. First, the holding in *Lane* is perfectly consistent with the holding in *Chrzanowski*. The fact that assistant state's attorneys occasionally testify pursuant to their official duties in cases which their office is prosecuting does not mean that their official duties include providing eyewitness testimony against their superiors regarding actions they have observed in the office. The fact that plaintiff failed to request time off to testify as a private citizen does not transform his testimony (or anything else an employee chooses to do while "on the clock") into an

---

[1] The Seventh Circuit's analysis was limited to the first step, and the court noted that "[w]e conclude by emphasizing that we express no opinion on the merits of Chrzanowski's claims. We hold only that at this preliminary stage, he has stated a valid First Amendment claim." *Chrzanowski*, 725 F.3d at 743.

7

action made pursuant to his official duties. Thus, the court finds that plaintiff has raised a genuine dispute as to whether his testimony was protected speech.[2]

The analysis then turns to whether plaintiff's testimony was "a substantial or motivating factor in the alleged retaliatory action," *see Lalowski*, 789 F.3d at 790, and whether those actions would have been taken even in the absence of his testimony. The court will conduct this analysis with regard to the claims against defendant Bianchi and defendant Combs, respectively.

1. Defendant Louis A. Bianchi.

Plaintiff contends that Bianchi, as his supervisor, retaliated against him for his testimony by terminating him. Defendant counters that plaintiff's testimony was not a motivating factor and in fact he was terminated because Bianchi believed that he falsified the August 9, 2010 blue back entry pursuant to his official duties as a prosecutor.

Defendant's arguments illustrate nothing more than their version of the disputed facts and the inferences to be drawn from those facts. As noted, the court's duty at the summary judgment stage is to construe all facts and draw all inferences in the light most favorable to the non-moving party. *See Schepers*, 691 F.3d at 913. The court is not allowed to weigh evidence or determine the credibility of witness testimony. *See O'Leary,* 657 F.3d at 630. As such, the court must assume that plaintiff's August 9, 2010 blue back entry and his testimony in the Bianchi case was truthful, including the fact that Salgado did send the voicemail and Bianchi took a special interest in the Reid plea by showing up to the court hearing and gesturing to the family. Moreover, it is undisputed that after plaintiff's testimony, Bianchi began placing negative comments in plaintiff's personnel file, asked another ASA to research whether "an employee could be terminated after they testified in a case[,]" [115-3] at 10, and actively reviewed the Reid file before directing Combs to investigate whether plaintiff had lied. In addition, plaintiff testified that other employees were terminated or forced to resign after testifying in the Bianchi prosecution.

A reasonable jury could infer from these facts that Bianchi did in fact retaliate against plaintiff because of his testimony. *See Massey v. Johnson*, 457 F.3d 711, 717 (7th Cir. 2006) ("Circumstantial proof, such as the timing of events or the disparate treatment of similar individuals, may be sufficient to establish the defendant's retaliatory motive."). While defendants contend that Bianchi had no reason to retaliate against plaintiff for the testimony, a reasonable jury could draw the same inference plaintiff did when he testified that "[m]aybe Mr. Bianchi took issue with the fact that I relayed that he was in court and that he gestured to the family. I mean, maybe Mr. Bianchi took issue with my testimony, period. Or the fact that I met with the special prosecutors. His attorney certainly took issue with that." [109-1] at 35. Another reasonable inference is that Bianchi retaliated for testimony he perceived as against a friend and ally, because "Mr. Salgado and Mr.

---

[2]Defendants again claim that they are entitled to qualified immunity on this basis. For substantially the same reasons, the court finds that the record presents no reason to second guess the Seventh Circuit's unequivocal rejection of this argument.

Bianchi have been friends for years. And if it came to a pick and choose, I was out the door well before Mr. Salgado ever was leaving this office. Mr. Salgado was way more important to Mr. Bianchi than I ever was going to be." [109-1] at 39.

Defendants spend considerable effort arguing that Bianchi was entitled to form the belief that plaintiff lied when he made the August 9, 2010 entry and terminate him on that basis, which would be permissible even if Bianchi was ultimately mistaken. *See Swetlik v. Crawford*, 738 F.3d 818, 828 (7th Cir. 2013) (finding that "an employer may defeat a First Amendment retaliation claim if supervisors reasonably believed, after an adequate investigation, that the employee's testimony was false, even if it actually was true") (internal quotations and alterations omitted). They contend that even if plaintiff's testimony was a motivating factor in his termination, he still would have been terminated due to Bianchi's reasonable belief that plaintiff lied in the pursuit of his duties. A reasonable jury may in fact draw this inference from the facts, particularly if they find Bianchi's testimony more credible than plaintiff's. But plaintiff correctly points out that there is a genuine issue of material fact as to whether the August 9, 2010 blue back entry was merely a pretext and that in fact he was terminated for testimony which Bianchi construed as against him and Salgado; this is so even if he cannot directly "disprove" Bianchi's stated reason for terminating him. *See Valentino v. Village of South Chicago Heights*, 575 F.3d 664, 673 (7th Cir. 2009) (finding that "the district court suffered the misapprehension that a plaintiff necessarily must proffer different or additional evidence to rebut pretext from that she used to establish her prima facie case. This is not so. Often, the same evidence used to establish the prima facie case is sufficient to allow a jury to determine that a defendant's stated reason for terminating a plaintiff was a mere front for an ulterior, unlawful motive").

At this stage, plaintiff is only required to raise a genuine issue of fact as to whether his testimony was "a substantial or motivating factor in the alleged retaliatory action," and whether Bianchi's proffered explanation for why he would have been terminated regardless of his testimony is mere pretext. *See Lalowski*, 789 F.3d at 790. Given the evidence in the record, the court finds that plaintiff has raised a genuine issue of fact and that an inference of retaliatory motive is supported by more than "speculation or conjecture." *See Swetlik*, 738 F.3d at 829. Thus, the parties' factual dispute must be resolved by a jury rather than this court as a matter of law.

Because plaintiff has raised a genuine dispute as to whether Bianchi terminated him for his truthful testimony, defendants' motion for summary judgment with regard to Bianchi [107] is denied.

2. Defendant Michael P. Combs.

Plaintiff contends that Combs retaliated against him by investigating him and then interrogating him on December 2, 2011, prior to his termination, asking questions even after he asked for an attorney. *See* [112] at 13. Although plaintiff concedes that Combs was not his supervisor, he contends that this is not required for him to be held liable for First Amendment Retaliation under § 1983. *See id.* Defendants counter that "Plaintiff cites no case where retaliation has been found, under the Civil Rights statutes or any other statute, where a non-supervisory

9

employee, like Combs, has been held liable for retaliation on the basis of an investigation conducted at his employer's request into alleged wrongdoing or later questioning the employee about his conduct. Plaintiff's failure to cite such a case is not surprising. If it were true, no employer could ever delegate to an employee an investigation into suspected wrongdoing or question another employee about his conduct." [117] at 11. Defendant's argument is well taken.

It is true that the Seventh Circuit has held that "[i]n the . . . context of public employees who allege that their employers retaliated against them based on assertions of First Amendment rights, we have observed that a § 1983 case does not require an adverse employment action within the meaning of the antidiscrimination statutes, such as Title VII of the Civil Rights Act of 1964. Rather, any deprivation under color of law that is likely to deter the exercise of free speech is actionable." *Mosely v. Board of Educ. of City of Chicago*, 434 F.3d 527, 533-34 (7th Cir. 2006) (internal quotations and alterations omitted). A "plaintiff [may] proceed with [a] § 1983 claim on the basis of allegations of something less than a 'tangible detriment,' such as an outright discharge, *see, e.g., Muller v. Conlisk*, 429 F.2d 901, 903 (7th Cir.1970) (mere threat of sanctions may be sufficient to allege First Amendment injury), or even a constructive discharge." *Mosely*, 434 F.3d at 534. Perhaps in some circumstances, investigation and questioning could be considered retaliatory action. While the Seventh Circuit does not appear to have confronted the issue, it is less clear how a co-worker with no supervisory capacity could create a "deprivation under color of law[.]" *See Mosely*, 434 F.3d at 534; *see also Johnson v. Louisiana*, 369 F.3d 826, 831 (5th Cir. 2004) ("As to causation, only final decision-makers may be held liable for First Amendment retaliation employment discrimination under § 1983."). But given the relatively fluid definition of retaliatory action within the context of first amendment retaliation, perhaps that too could be possible in the unique situation in which that co-worker has authority to bring criminal charges.

Regardless of whether a non-supervisor could in certain circumstances retaliate against a co-worker through investigation and questioning, the court need not resolve those questions in this case because they present a red herring; there is no evidence in the record to support an inference that Combs investigated or questioned plaintiff due to a retaliatory motive. It is undisputed that Combs initiated a limited investigation regarding the August 9, 2010 blue back entry because he was asked to do so by his supervisor. *See* [119] at ¶ 43. There is no evidence that Combs was interviewed or otherwise involved in the special prosecution against Bianchi. *See id.* Finally, there is no evidence that Combs was present at the December 2, 2011 meeting or questioned plaintiff for any reason other than the fact that he was asked to do so by Bianchi because he had conducted the investigation. The only evidence plaintiff presents is that Combs was a friend and political ally of Bianchi. This is insufficient to create a reasonable inference that plaintiff's testimony was a motivating factor in his investigation or questioning. *See Lalowski*, 789 F.3d at 790. Even if it was, a directive from one's employer is surely sufficient to "establish that the same action would have been taken in the absence of the employee's protected speech" and there is no reason to believe that justification was mere pretext. *See Lalowski*, 789 F.3d at 790. As such, plaintiff has not raised a question of material fact as to whether Combs retaliated against him on the basis of his protected speech and the claims against him must fail.

10

For the foregoing reasons, defendants' motion for summary judgment with regard to defendant Combs [107] is granted.

Date: 8/07/2015          ENTER:

*Philip G. Reinhard*

United States District Court Judge

Electronic Notices.  (LC)